[Nos. 27517, 27518.   *En Banc.*   October 2, 1940.]

JAMES R. CHADWICK *et al., Respondents,* v. LOUIS EK *et al., Appellants.*

MARTHA Y. BENOIT, *as Executrix, Respondent,* v. LOUIS EK *et al., Appellants.*[1]

[1]Reported in 106 P. (2d) 104.

*Ballinger, Hutson & Boldt,* for appellants.

*George F. Hannan,* for respondents Chadwick *et al.*

*Little, Burgunder & Smith* and *Eugene O. Forest,* for respondent Benoit.

*H. Sylvester Garvin, amicus curiae.*

SIMPSON, J.—This proceeding comes before us upon a motion presented by respondents for permission to present to the trial court a motion for a new trial.

The pertinent part of the motion states:

"Come now the respondents, James R. Chadwick and Esther James Chadwick, his wife, and Martha Y. Benoit, as Executrix of the Estate of Raoul S. Benoit, deceased, and respectfully petition that leave be granted to them to apply to the trial court in this case and that the trial court be permitted to pass upon a motion for a new trial based upon all the statutory grounds, and upon all other lawful grounds including newly discovered evidence, evidence which could not be procured at the time of trial although known at that time; suppression and attempted suppression of material evidence in the trial court by appellants, defendants below, and improperly assisting and abetting a material witness for the plaintiffs to leave the jurisdiction of the State of Washington, so that he could not testify at the time of trial in plaintiffs' behalf, and paying him certain money to go from Seattle to Portland, when defendants knew that he was a material witness who would testify favorably for plaintiffs—respondents—at the trial."

Affidavits to which reference will hereafter be made were filed in support of the motion.

A full and complete statement of the facts which gave rise to the action, of which this proceeding is a part, is made in *Chadwick v. Ek,* 1 Wn. (2d) 117, 95 P. (2d) 398.

The accident occurred January 5, 1938. Two trials were had of the Chadwick case; one beginning September 22, 1938, resulting in a mistrial, and the other started December 12, 1938, resulting in a verdict for respondents. The Benoit trial was held December 20, 1938, and judgment given to the respondent in that case.

The cases were appealed to this court and reversed November 1, 1939. A petition for rehearing was denied February 24, 1940. The present motion was filed March 25, 1940.

In order that a motion may be granted allowing a litigant to present to the trial court a motion for new trial, it is necessary that the facts contained in the application make a *prima facie* showing which would warrant the trial court in favorably passing upon the motion. *Haaga v. Saginaw Logging Co.,* 170 Wash. 93, 15 P. (2d) 655; *White v. Donini,* 173 Wash. 34, 21 P. (2d) 265.

The grounds for a new trial asserted in the petition are, in substance, (1) newly discovered evidence which respondents could not, with reasonable diligence, have discovered and produced at the trial; and (2) alleged irregularities and misconduct of appellants.

In *Morrow v. Morrow,* 179 Wash. 329, 37 P. (2d) 692, this court, in the following language, laid down the rule which must govern those who apply for a new trial upon the grounds of newly discovered evidence:

"Heretofore, a motion was made by appellant to remand the case to the trial court for the purpose of

passing upon alleged newly discovered evidence and to pass upon her petition to vacate the judgment. This motion was deferred to be heard when the appeal was submitted on the merits.

"After reading and considering the affidavits presented in support of this motion, we find that the motion is not well taken. The affidavits as to some of the proffered testimony show that the evidence would be merely cumulative and impeaching in character, as to which there was evidence introduced by appellant at the trial of the case. The affidavit of appellant and one of her present counsel do not allege that the other witnesses were not available, or that any attempt had been made to obtain their evidence previously.

"To justify the granting of such a motion, it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; (5) that it is not merely cumulative or impeaching. *Libby v. Handy,* 163 Wash. 410, 1 P. (2d) 312 (not cited by either party). To the same effect are: *Peoples v. Puyallup,* 142 Wash. 247, 252 Pac. 685; *Eyak River Packing Co. v. Huglen,* 143 Wash. 229, 255 Pac. 123, 257 Pac. 638; *Pylate v. Hadman,* 151 Wash. 245, 275 Pac. 559; *White v. Donini,* 173 Wash. 34, 21 P. (2d) 265; *State v. Wynn,* 178 Wash. 287, 34 P. (2d) 900."

A review of the showing made by the affidavits of respondents and appellants and the conduct of the trial is necessary to ascertain whether respondents have met the requirements of the rule.

The witness from whom respondents represent they are able to secure their new evidence is Frank Johnston, who was present at the time the accident which caused the death of Raoul S. Benoit and injuries of Mrs. Chadwick occurred. The evidence sought to be elicited from the witness relates to the place upon the highway

occupied by Mrs. Chadwick at the time she was injured. Respondents contend that the witness would testify that Mrs. Chadwick was standing upon the dirt shoulder of the highway instead of upon the pavement, as testified by witnesses at the trial and as found by the special verdict of the jury; further, that the witness would testify that he warned the appellant Ek of the position of Benoit and Mrs. Chadwick.

George F. Hannan, attorney for respondents Chadwick, talked with Johnston on four occasions. The first was at Renton shortly after the accident; the second was when Hannan brought to Johnston a typewritten statement concerning the accident; the third, when Johnston called at Hannan's office; and the fourth was at the attorney's office about August 20, 1938. All of these contacts were made prior to the trials.

The pertinent portions of the written statement prepared by Hannan and stated by him to be at Johnston's direction, but which was not signed by Johnston, read:

"On January 5, 1938, Between 830-9 oclock I witnessed an accident on the Dunlap Canyon Road about four miles north of Renton, and I make the following statement:

"I was walking north in the direction of Seattle with two companions, one named Keenan and the other named Andrew Johnson. The morning was cold and foggy and the visibility I should judge was about 70 or 80 feet. We were walking on the extreme west of the pavement on the south traffic lane, but nevertheless we were walking north facing the traffic.

"When about 200 feet from the point of the Ek accident I heard a crash and myself and my companions went to find out what was the matter. After traveling about 150 feet we came to a car which we afterwards learned to belong to Mrs. Chadwick. This car was parked directly parallel to the easterly side of the pavement, about 18 inches of the car was on the pavement; that is the two left wheels were just about at the edge

of the cement gutter. The tail light was burning on the Chadwick car.

"When we came up close to the accident Mrs. Chadwick was out of her car and was standing on the dirt shoulder of the road almost to the edge of the pavement and about a foot behind her own car. She was talking to a young boy who was in Mr. Benoit's car. Mr. Benoit was about three or four feet back of the car and about four feet from the edge of the pavement and was apparently looking at some damages on the Chadwick car. We afterwards learned that Benoit had sideswiped the Chadwick car and hit the left rear fender.

"The Benoit car was parked partially on the dirt shoulder and partially on the pavement about 40 feet to the north of the Chadwick car.

"Mrs. Chadwick's car was parked as far off the highway as it was possible to park it. At that point the dirt shoulder of the highway is approximately 3½ feet wide, then a ditch begins and Mrs. Chadwick's car was parked right up to the edge of the ditch. The ditch is between two and three feet deep. She could not have gone any further without having gone into the ditch.

"When I got to the Chadwick car her emergency brake was set so as to completely stop the car.

"When I came to a point about 40 feet south of the Chadwick car I noticed the Ek car coming from the south. Ek was driving north at a speed of about 15 miles per hour and his right wheels were out about 10 inches from the gutter. I knew that if he proceeded on that course that he would strike the Chadwick car, so as I saw him coming I ran with his car and when about 40 feet from the Chadwick car I jumped onto the running board of Ek's car and told him to stop his car. Ek was driving with his head out of the window looking at the yellow line in the center of the highway. Ek paid no attention to me and continued to drive his car in that same position and at the same speed until he came upon Benoit and was sure to hit him. I jumped off the Ek car just before he hit Benoit. Just before he struck Benoit he turned his car to the right, and

about the center of his car hit Benoit and threw him about 25 feet. When he turned to the right a portion of his car ran onto the dirt shoulder of the road and struck Mrs. Chadwick and knocked her partially under her own car. As Ek hit Benoit his hood flew up and broke his windshield.

"After the collision the Ek car was close up to the Chadwick car. Myself and my companions picked up Benoit and put him on the right shoulder of the road. We then went back to pick up Mrs. Chadwick. We could not handle her because the cars were too close together, so I drove the Chadwick car forward a few feet. A portion of Mrs. Chadwick's body was under the axle of the Ek car, and I had to and did move the Ek car so that it would not cover her body. We then picked up Mrs. Chadwick. Mrs. Chadwick was conscious. She told us to get her blanket and asked me to take care of her purse.

"Up to this time no considerable crowd had gathered. We put Mrs. Chadwick in somebody's car; I do not know whose, and they drove her away to the hospital.

"The windshield of Ek's car was completely frosted and clouded with ice and there was no visibility through it. Ek had plenty of time to stop his car after I told him to stop it, if he had heeded my warning."

Johnston stayed at Renton for a short period of time after the accident, and then visited a sister at Indianola, near Seattle. About January 11, 1938, Johnston delivered the above statement, unsigned, to representatives of the company which carried the insurance upon the Ek car. On or about August 19, 1938, Johnston called at the insurance company's office in Seattle and advised its representatives that he was leaving the vicinity because he could not find work. He was asked if he could locate a Mr. Keenan, another witness of the accident. Johnston stated that he would try to find the witness and was given five dollars to pay his fare to Portland and return, with instructions to call at the Portland office and take Keenan

with him when located. Johnston went to Portland, contacted the insurance company's office there, but did not find the witness Keenan. Shortly afterwards he went to Omaha, Nebraska.

At the instance of respondents' attorneys, Johnston, then in Omaha, Nebraska, made an affidavit dated March 7, 1940. The contents of this affidavit relative to the accident are in the identical words of the statement to which we have just referred and prepared by Mr. Hannan some time during the month of August, 1938.

March 22, 1940, Johnston made an affidavit as follows:

"State of Nebraska ) ss.
County of Douglas )

"Frank E. Johnston, being first duly sworn states as follows:

"That he is the Johnston who was at or near the scene of an accident between Renton and Seattle on Jan. 5, 1938 in which the Ek, Chadwick cars were involved.

"That he has examined the attached original witness statement written on 5 yellow sheets and 1 sketch and that this statement is the one given by the undersigned to one Evans after the accident; that this statement and sketch accurately and correctly set out the facts of the accident so far as the undersigned knew them to be and the undersigned has never intentionally or knowingly given any statement in conflict therewith.

"That the undersigned has also examined the attached statement consisting of three pages of white paper; that this white paper statement is one that was prepared by Mr. Hannan, the attorney for the Chadwicks, and submitted to the undersigned, but was never signed by the undersigned; that originally Mr. Hannan took a statement from the undersigned which was substantially the same as the yellow paper statement which the undersigned did sign, and this white paper statement was prepared by Mr. Hannan, he inserting considerable material of his own, which altered

the version of the accident as given to him by the undersigned.

"That when affiant signed the affidavit he recently signed for Mr. Hannan he assumed that it was in accordance with the true facts as stated in the original statement of the undersigned.

"That the undersigned lived at the Renton City Hall getting his lodging and meals from Mr. Chadwick for a period of two weeks following which the undersigned returned to Indianola for two weeks and then returned to Renton for a period of about 4 days again staying at the City Hall, when the undersigned told Mr. Chadwick that he was intending to return to Omaha; that at the same time the undersigned called on Mr. Hannan at his office in Seattle and told him that the undersigned intended to leave for Omaha and that Mr. Hannan made no objection thereto and said it would be all right with him, since he had the undersigned's address in Omaha. That it was on this same day, and after talking to Hannan, that the undersigned called at the Insurance Company office and left the unsigned white paper statement that Mr. Hannan had prepared with Mr. McCaffery. Also at this time the undersigned received $5 from Mr. McCaffery as bus fare to Portland from Seattle and return, solely for the purpose of the undersigned going to Portland to try and locate Keenan which he was unable to do.

"That the undersigned 'bummed' his way back to Omaha on the freight trains and this was without the suggestion, assistance or help of anyone.

"This statement has been written by Mr. Boldt in my presence and has been read to me in the presence of the notary public and I have read it and it is true and correct in every particular. Mr. Boldt has explained to me that he represents Ek and the Insurance Company and no inducement or pressure of any nature has been given to secure my giving and signing this affidavit.                            Frank Johnston

"Subscribed and sworn to before me, James M. Johnson, Notary Public by Frank Johnston this 22nd day of March, 1940.

Notarial Seal                 James M. Johnson
Commission expires Feb. 9, 1946.     Notary Public."

Attached to the affidavit was a letter and sketch, which we set out, as follows:

"Frank E. Johnston    Indianola, Wn.
Box 15, Kitsap P. O.    January 11, 1938
Kitsap, Wash.

"I Mr. F. E. Johnston having been on my............... from Los Angeles to visit my sister at Indianola Wn. the morning of January 5, 1937 accompanied by Tom Keenan, A. G. Johnson had been kicked off a freight train in Renton, Wn. about 6:30 A.M. We were then walking toward Seattle along the Dunlop canyon road. By the time we got to a point where we heard a crash we had walked about 3 to 4 miles out of Renton.

"We were walking on the So bound lane going north toward Seattle, Wn. At about the place above mentioned we heard a crash which occurred about 100 feet from where we were standing. The accident occurred on the No bound traffic lane.

"Naturally being interested in what happened we went over to these two cars for at the time of the first crash we could not see what had happened because of the fog.

"It looked to me as tho the driver of car No. 2 had pulled to the shoulder, stopped and was cleaning her windshield. Then car No. 1 traveling North struck the left rear of car No. 2. Then No. 1 pulled ahead and stopped about 20 ft. ahead of No. 2.

"Both car No. 1, & No. 2 were paralell to the road with about 14 inches onto the highway. The tail light of the car No. 2 was burning up to the time No. 3 entered the picture.

"At the time No. 3 came along traveling not over 15 miles per hour I was standing to the rear of car No. 2, on the yellow center lane of the No bound lane. In fact I thought this No 3 was going to hit me.

"Visibility at this time of morning about 8:30 A.M. was not to exceed 50 feet. I saw car No 3 poking along yelled at the on coming coupe or No. 3. Never the less he came on thru. At this time Benoit was standing to the left rear of Mrs. Codwich car No 2, and Mrs. Chadwick was standing directly behind her machine just on the highway. No. 3 car struck Benoit throwing

him North about 20 feet to the center strip between the two one way roades. Then he struck Mrs. Chadwick pinning her against her own machine. And we had to push her car ahead in order to free her. The impact of No 3 brook the tail light which was burning on car No. 2. This I know was on for I shut the lights off car No. 2.

"The first move we made was to get Benoit out of the center and over to the shoulder, then to free Mrs. Chadwick. The boy who was a passenger of Benoits was standing two or three............to the left side of car No 2 being about even with the front windows.

"The old gentlemen riding in car No 3 received sever.......... cuts about the head and face when his head went clear thru the windshield. The lights were on the coupe or No 3 all the time until the patrol car came.

"The driver of car No 3 had his head out the window on the left side watching the yellow line at the time of the impact.

"Tom Steen pulled off his coat and ran about 100 to 150 feet so to flag down traffic. Johnson stayed along with me to do what ever he could.

"Incidentally Car No 2 was shoved ahead about 3 feet from the impact of No 3. The first man to arrive at the scene took Mrs. Chadwick to the Renton hospital, the passenger of No 1 took Benoit to Seattle, and the old gentlemen from Ek's machine. To my knowledge Ek made no statement.

"Benoit and Mrs. Chadwick had their backs to the oncoming No 3.

"At the point of this accident there is a 4 to 5 foot shoulder a slight ditch and then a bank all near a concret...... drain ditch from the edge of the road.

"I have read this statement knowing the same to be true and correct to the best of my knowledge and judgment.                    Frank E. Johnston."

April 13, 1940, he made another affidavit in the fol-
lowing language:

"That he is the Johnston who was at or near the
scene of an accident between Renton and Seattle,
Washington on January 5, 1938, in which the Ek,
Chadwick cars were involved.

"That about 9:30 this morning V. J. Skutt called

upon him and showed to him the affidavit which he had signed on March 7, 1940 before Ada Seater, a Notary Public of Omaha, Nebraska, and the affidavit which he had signed on March 22, 1940 before James M. Johnson, Notary Public, Omaha, Nebraska, and the statement signed by him on January 11, 1938 at Indianola, Washington attached to said affidavit of March 22, 1940. That affiant desires to explain the statement on Page 3 of the report signed by him on January 11, 1938 reading as follows: 'At this time Benoit was standing to the left rear of Mrs. Codwick car No. 2 and Mrs. Chadwick was standing directly behind her machine just on the highway,' and the statement on Page 7 of his affidavit of March 7, 1940, reading as follows: 'I have been informed that the jury in the above case made a finding that Mrs. Chadwick was on the pavement of the highway when she was struck. That is not true. She was very close to the concrete but she was not on it. She was on the dirt shoulder of the road. It also is not true that Ek did not have notice of this danger. I warned him myself and shouted at him but he would not stop and he had plenty of time to stop.'

"Mrs. Chadwick was standing between the center and the right end of the rear bumper, and was on the shoulder to the right of the edge of the pavement, and the statement contained on Page 7 of my affidavit of March 7, 1940 is correct.

"This affidavit is made by me in the chambers of Judge Charles Leslie in the Court House, Omaha, Nebraska, at about 10:30 A.M. on the morning of April 13, 1940, in the presence of James M. Johnson, Loran F. Wheeler and V. J. Skutt, and I hereby state that no inducement or consideration of any kind has been given to me or promised to me by anyone for signing this affidavit or for signing the affidavit of March 7, 1940 and March 11, 1940 relating to this same matter."

We are of the opinion that there has been a failure on the part of respondents to satisfy the requirements set forth in *Morrow v. Morrow, supra.*

An examination of the remarkably vacillating

series of affidavits bearing the signature of Johnston, as set forth earlier in this opinion, makes it clear to us that whatever testimony he might give, were this motion to be granted and a new trial to take place, would be valueless. It will be noted that his first affidavit places Mrs. Chadwick on the highway, the second on the dirt shoulder, the third back on the highway, and the fourth one back on the dirt shoulder again. Just what caused Johnston to reverse his field with such regularity is something which we have no way of determining, of course. However, it is evident that the testimony of such an unstable witness, being in direct conflict with that of a number of disinterested witnesses, could not afford a basis for our finding that "the evidence is such as will probably change the result if a new trial is granted," and the first requirement for a new trial upon the grounds of newly discovered evidence is therefore unsatisfied. No court would be justified in considering such evidence as sufficient upon which to grant a motion for a new trial.

Obviously, the evidence of Johnston was not new, and the second of the requisites for a new trial for newly discovered evidence is therefore not present here. The Chadwicks and their attorney, Mr. Hannan, knew of it months before the trial. Mr. Hannan talked with Johnston concerning the accident on more than one occasion, and Johnston lived at the Renton City Hall for two weeks and four days "getting his lodging and meals from Mr. Chadwick," Mr. Chadwick being a member of the police force.

"The very foundation of setting aside a verdict for newly discovered evidence rests upon the basis that the evidence is new; that it was not known to the party till after the trial, and accordingly a motion for a new trial on the ground of newly discovered evidence is properly overruled where the movant fails to show that the evidence was discovered since the trial. Evi-

dence within the knowledge of a party at the time of trial, though he was absent from the trial, and failed to communicate it to his attorney, is not newly discovered. Nor will a new trial be granted for newly discovered evidence merely because new counsel believes that evidence of a fact may be material, if the original counsel had full knowledge of the facts from the beginning of the controversy. Where evidence is discovered before the conclusion of the trial, or where an expected witness is absent, or incompetent, an application must be made to postpone the trial so as to give an opportunity to procure such witness or evidence." 20 R. C. L. 291, § 73.

Nor do we feel that due diligence was exercised by respondents in attempting to get this evidence during the trial. Mr. Hannan was counsel for Mrs. Chadwick during both trials. He did not at either of them mention Johnston or his supposed testimony. Although he knew that Johnston was an eye witness of the accident, he did not present to the court a motion for a continuance. He knew that Johnston was an itinerant, and took no precaution whatever to secure his deposition or subpoena him as a witness.

In *Clemans v. Western,* 39 Wash. 290, 81 Pac. 824, a motion for new trial was presented upon the ground of accident and surprise. In support of the motion, affidavits were presented showing that the son of the parties was a material witness on behalf of the father; that he was with his father almost daily previous to the trial, and disappeared a few days before the trial started. In passing upon this motion, the court stated:

"No subpoena had been served upon the boy, and no continuance was asked by reason of his absence, and at the close of the case no mention appears to have been made of the fact that the plaintiff relied upon the evidence of the son which could not then be had. But the case appears to have been rested entirely upon the evidence then introduced. Three uncontradicted affidavits were filed on behalf of the respondent, to the

effect that the son, Peter, was in the city of Seattle during the trial, and did not leave there for California until the next day after the conclusion of the trial. At any rate, we think ordinary prudence required that a subpoena should have been served upon the witness; or, when it was discovered before the trial that he was absent and his testimony could not be had, a continuance should have been requested upon a showing. These precautions having been omitted, and no mention made of the absence of this witness until after an adverse decision, and the case having been submitted on other evidence, appellant ought not now to be heard to complain."

Of like import is *Mueller v. Washington Water Power Co.*, 56 Wash. 556, 106 Pac. 476. Also, *Libbee v. Handy,* 163 Wash. 410, 1 P. (2d) 312.

Further, the evidence which Johnston would give would simply be "cumulative or impeaching," and would therefore present a further reason for denying the motion for a new trial based on new evidence. At best, Johnston would testify to the fact that Mrs. Chadwick was on the dirt shoulder, rather than on the highway itself. This, however, is a position which was taken by Mrs. Chadwick in her testimony, and Johnston's testimony to that same effect would be cumulative. Since there was testimony by other witnesses which indicated that the facts were different than was indicated in Johnston's pro-respondent affidavits, the testimony which he might give, if in conformance with the story he told in those affidavits, would be of an impeaching nature; and this fact, taken along with the fact that there was already evidence to the same effect given by Mrs. Chadwick, indicates that the requirement that the new evidence, in order to support the motion for a new trial, must not be merely cumulative or impeaching, was not satisfied.

It will thus be seen that the only one of the five required elements for a new trial based on new evidence

which was present here was the materiality of the evidence to the issue. Each of the other four elements was lacking; and since, in *State v. Adams,* 181 Wash. 222, 43 P. (2d) 1, we held that the absence of one or more of the elements warranted a refusal of a new trial, it is apparent that the absence of four of the elements leaves us with no alternative but to refuse the motion based on new evidence.

It is quite evident that respondents and their attorney did not believe that the evidence of Johnston was desirable or essential when the case was prosecuted to the court and jury. At those times, all of the evidence which Johnston would have given, as indicated by the statements contained in the so-called yellow sheets and the fact that Johnston had refused to sign the typewritten statement prepared by Mr. Hannan, was opposed to respondents' contention that Mrs. Chadwick was standing on the dirt shoulder at the time of her injury. Every indication given by Johnston up to the time he signed his affidavit of March 7, 1940, was that he would testify that Mrs. Chadwick was standing on the pavement at the time she was struck by the Ek car.

We are unable to agree with respondents that appellants and the representatives of the insurance company were guilty of any misconduct. The affidavit of Johnston and those of the officers of the insurance company prove that Johnston was given five dollars as expenses to go to Portland, Oregon, and return, in order to locate a man named Keenan, who was with Johnston at the time of the accident.

There was nothing wrong, nor even a suspicion of wrongdoing, in the actions of the insurance men, the appellants, or their attorneys in any of their actions connected with the trial of the case or any of the proceedings before or after the trial.

Respondents contend, and support their contention by affidavits, that Mrs. Chadwick was very ill and nervous at the times the case was tried, and insist that, for this reason, the motion should be granted, so that another jury could hear and see her when she was in a better condition to testify.

We have again read the testimony given by Mrs. Chadwick, and find no indication that she was laboring under any physical or mental handicap. On the other hand, her testimony was clear, concise, and to the point.

Respondents did not include this ground in their motion, nor do we find any statutory grounds upon which the court could consider the question of respondent's condition.

We conclude that the showing made by respondents is insufficient to justify the granting of their motion, and it is accordingly denied.

STEINERT, ROBINSON, JEFFERS, and DRIVER, JJ., concur.

MILLARD, J. (dissenting)—In *Haaga v. Saginaw Logging Co.,* 170 Wash. 93, 15 P. (2d) 655, followed in *White v. Donini,* 173 Wash. 34, 21 P. (2d) 265, we held, in a five to four opinion, that, after judgment was affirmed and rehearing denied, we would grant an application of the appellants for permission to file a petition in the superior court, to which the cause was tried, for vacation of the judgment upon the ground that the successful plaintiff prevaricated concerning the seriousness of his injuries, to recover for which judgment in the amount of forty thousand dollars was rendered.

If the showing there made entitled appellants to reopen the case for the purpose of reducing or setting aside the alleged excessive award, the showing in the case at bar entitles the respondents to reopening of

their case. As an appellate court, we have no right to say what weight should be given to the evidence upon which respondents rely; that is an invasion of the jury's province.

The showing in *Haaga v. Saginaw Logging Co., supra,* no more entitled appellants to reopening of that case than does the showing in the case at bar entitle respondents to permission to file a petition in the superior court for a new trial.

BLAKE, C. J., BEALS, and MAIN, JJ., concur with MILLARD, J.

