[No. 31457. Department One. December 28, 1950.]

GEORGE R. PADDOCK, *Appellant*, v. LEROY L. TODD *et al.*, *Respondents and Cross-appellants.*[1]

[1] Reported in 225 P. (2d) 876.

*Charles R. Carey* and *John F. Walthew,* for appellant.

*Warren J. Gilbert, Weter, Roberts & Shefelman,* and *James Gay,* for respondents and cross-appellants.

DONWORTH, J.—George R. Paddock commenced this action to secure a decree quieting title to stock certificate No. 694, representing twenty shares of class A stock of the Anacortes Veneer, Inc., and directing the defendants to forthwith deliver this stock certificate to him or to pay the value thereof. Defendants, by way of cross-complaint, asked that the complaint be dismissed and that the plaintiff be required to account to the defendants for certain income derived from the stock. The plaintiff, by his reply, denied the material allegations of the cross-complaint.

Prior to the trial, the plaintiff's demand for a trial by jury was stricken for the reason that the trial court determined the action to be one in equity. At the conclusion of the trial, the court entered findings of fact and conclusions of law and a judgment and decree dismissing the plaintiff's action and decreeing the defendants to be the sole owners of stock certificate No. 694. From this judgment and decree, the plaintiff has appealed.

In the exercise of its equitable powers, the trial court also refused to grant the defendants any relief on their cross-complaint. From this portion of the judgment and decree, the defendants have cross-appealed.

During the pendency of the appeal, appellant applied to this court for leave to present newly discovered evidence to the trial court through a motion to vacate the judgment and in the alternative for a new trial. Upon being granted this permission, the appellant presented this motion to the trial court. The motion was denied. The present appeal is a consolidation of the original appeal and the appeal from the order of the trial court denying appellant's motion.

For the remainder of this opinion, Mr. Todd will be referred to as though he were the sole respondent.

Since this case involves disputed questions of fact, it is necessary to state rather fully the circumstances out of which this controversy arose.

Anacortes Veneer, Inc., was organized in 1937, as a co-operative venture, it being the intention of its organizers that, with few exceptions, only its employees would be stockholders. The company planned to distribute the profits in the form of higher wages to its employees rather than by declaring dividends. Therefore, the value of the stock was based largely on the stockholders' ability to work for the company.

Prior to December, 1943, it was common practice for stockholders to make arrangements with nonstockholders whereby the latter would become employees of the company and "work" the stock at the company's plant and pay to the stockholders an agreed share of their earnings for this privilege. In 1943 the internal revenue bureau held that the money received by nonworking stockholders was a dividend rather than a wage and thereupon levied a substantial deficiency assessment (approximately $200,000) against Anacortes Veneer, Inc., with respect to its income tax liability. In order to remedy this situation, a special stockholders' meeting was held in November, 1943, at which it was voted almost unanimously to abolish the sub-stitute "work" system effective December 1, 1943, and permit only *bona fide* stockholders to work at the plant thereafter. To prevent any subterfuge, all new employees were required to sign affidavits to the effect that they were *bona fide* stockholders.

The respondent is an attorney at law, having practiced his profession in this state since 1906. At the time of the transaction involved in this case, he was practicing in Anacortes. Appellant has lived in Anacortes since 1922 and until 1943 had worked at a succession of jobs as an unskilled laborer. A friendly social relationship had existed between appellant and respondent and their re-

spective wives since 1935 and they frequently visited one another's homes. Appellant occasionally did some odd jobs for respondent and whatever trivial legal matters appellant or his wife had were handled by respondent.

In July, 1942, the wife of respondent acquired twenty shares of class A stock in the Anacortes Veneer, Inc., for the sum of three thousand five hundred dollars. Arrangements were made by respondent with Harry Hoskins to "work" the stock for a determined amount. By September, 1943, Hoskins had purchased other stock in the company and no longer desired to continue "working" someone else's stock so respondent, who in the meantime had acquired the stock from his wife, entered into a working arrangement with J. Clarence Hetzel which lasted until December, 1943. The stock at no time had appeared in the records of the company as being owned by either respondent or his wife, since it was always placed in the name of the individual who was working the stock. However, respondent always obtained an assignment of the stock from the worker and retained physical possession of the certificate.

The testimony of the parties with respect to the stock represented by certificate No. 694 was directly in conflict. Respondent's version of the transaction was as follows: During the month of November, 1943, respondent and his wife were at appellant's home for a visit when appellant first inquired as to who was working respondent's stock. Respondent informed appellant that Mr. Hetzel was working the stock but that Hetzel was talking of buying some stock himself and would therefore very shortly be terminating his arrangement. At that time, appellant was employed regularly at a shipyard, but he indicated that he would be interested in working respondent's stock for less money than he had been receiving in order to be assured of having a steady job. No definite agreement was reached at that time but two or three weeks later, according to respondent:

"A. We were again at the Paddock home, and Mr. Paddock said, 'Is Mr. Hetzel going to continue to work the

stock?' I said, 'No, he tells me he is going to buy stock.' Mr. Paddock said, 'Can I work it under the same arrange-ment Mr. Hetzel did?'

"I looked at Mrs. Paddock because I knew she had raised the question before, and she said, 'Yes, we have talked it over and we have decided that George should go ahead and work the stock if he can.' And then I said, 'Then you want to go ahead and work the stock and get a dollar an hour?' And he said, 'Yes.' And I said, 'That is OK with me.'

"Q. Mr. Hetzel was paying you 25 cents an hour? A. Well, that is my recollection. I wouldn't be so sure about that."

Appellant's version of the transaction, as stated in his direct examination, was:

"Q. Just tell in your own words just how it came about that you went to work for the Anacortes Veneer? A. I came home from the shipyard and Mr. Todd came out in front, and I was out in front of the house when he came up. Q. Will you fix the date, as near as you can tell us? A. That I don't remember exactly. Q. About how long was it be-fore you went to work? Can you tell us that? A. It must have been a little while because I had to get my release from the shipyard. It was probably three or four days at least. Q. You just give us your best recollection. Go ahead and tell us. You say you were out in front of the house? A. Yes, and he came around, he came up to me and asked me if I wanted to buy some stock in the plywood, and I said yes. And he said that he paid $3500.00 for it and he would sell it to me for $4000.00. And so I said I would take it, and I paid him so much a month. Q. Let's not get to that. First just what occurred on that occasion. Was that the first time that any matter had ever been discussed between you relating to Anacortes Veneer? A. Yes. Q. What were your financial means at that time, as far as money in the pocket or bank is concerned? A. I didn't have any money at that time, not very much. I was just working. Q. At that particular meeting—I would like to keep these separate if you can in your own mind—at that first meeting out in front of your house was there any dis-cussion about how you were to pay for this, at that time? A. Yes. He asked me if I wanted to buy it, and I said yes and I would pay him so much a month for it. Q. You say so much a month. Was anything said further than that by

either of you? A. Well, we thought around about $40.00 a month or something like that would be right to pay at that time, and then as wages increased, why, I paid him a little more. Q. I want you to segregate in your testimony what happened. When I ask you what was said, I want to be sure that you are not testifying to what later happened. Is that what was said between you? A. Yes, he said that he wanted me to go to—to sell me the stock and I would go to work there."

Later he testified that "there was supposed to be six percent interest" (referring to this oral contract of sale).

Mrs. Paddock, who secured a divorce from appellant in 1947, fully corroborated the testimony of respondent to the effect that the arrangement between appellant and respondent was that the former was to "work" the stock and that there was no sale of the stock. Furthermore, appellant's twenty-two year old married daughter testified that the agreement had been to work the stock, but that she had been cautioned by her father not to let anyone know this fact. No attempt was made to impeach her testimony.

Appellant attempted to impeach the testimony of Mrs. Paddock by showing that a property settlement agreement was entered into by appellant and Mrs. Paddock, prior to their divorce, in which he was awarded all equity and interest in this stock. The interlocutory decree approved the settlement and awarded the equity and interest in the twenty shares of stock to appellant and, in compliance with the decree, Mrs. Paddock executed a bill of sale conveying to appellant "all equity and interest in" the stock. She testified that she told her attorney that the stock belonged to respondent and that neither she nor her husband had any interest in it. She said it was her understanding that the references to the stock in these documents meant that any equity therein (if there was any) was to go to her husband because she claimed no interest therein whatever.

On January 3, 1944 (the day that appellant began working for the company), the stock certificate (No. 654) standing in Mr. Hetzel's name was assigned to appellant

and by him delivered to the company for transfer. On January 14, 1944, when the formal delivery of the new stock certificate (No. 694), designating appellant as record owner, was made to him by the company, appellant signed an affidavit to the effect that he was the *bona fide* owner of the certificate and delivered the affidavit to the company. On the same date, appellant executed the assignment on the back of the certificate designating respondent as assignee and the certificate was immediately surrendered to respondent who has ever since had physical possession thereof. By separate instrument, appellant also assigned to respondent all credits for loans made by him to the company and all dividends declared during appellant's record ownership of the stock.

Respondent unequivocally denied that he had heard anything concerning the prohibition of the stock working arrangements between the time the oral agreement was made with appellant in December, 1943, and January 3, 1944, when appellant began working at the veneer plant. However, during the trial, the court expressed a disbelief that respondent, a lawyer in a town the size of Anacortes, did not know of the company regulation at that time.

At the beginning of the arrangement, respondent was to have everything appellant received over a dollar an hour, but, as wages were gradually raised from $1.25 per hour to $2.90 per hour, appellant obtained more. Settlements were regularly made in cash on the tenth of every month between respondent and appellant's wife, usually at the office of the Anacortes Mercury, a daily newspaper of which she was editor. Appellant, however, testified that he made these settlements with respondent at the latter's law office.

The method of dividing appellant's pay each month consisted of first adding the deductions (social security, withholding tax, medical aid, etc.). One-third of these items was charged to respondent and two-thirds to appellant. Then the number of hours worked by appellant during the preceding month was multiplied by the agreed wage (in January, 1948, it was $1.75 per hour) and the resulting

amount was retained by appellant. The balance (less one-third of the deductions) was paid to respondent.

Respondent never included these payments in computing his income tax liability because he felt that an income tax shouldn't be paid twice on the same money. He did not know the total amount he received from these settlements but admitted that during the years 1944 to 1947, inclusive, appellant paid him about .four thousand two hundred dollars.

In May, 1948, appellant determined that he had paid the full purchase price of the stock and thereupon refused to make any further payments to respondent and demanded possession of the stock certificate.

On his original appeal, appellant made eight assignments of error to the effect that the trial court erred in finding that the arrangement entered into by respondent with the appellant was not a sale of the twenty shares of stock in the Anacortes Veneer, Inc., and in dismissing the action of appellant.

This being an equity case, we are, of course, trying it *de novo*, and it is the duty of this court to read the entire record and determine for itself what findings should be made. However, where findings have been made by the trial court, they will be given great weight and if it appears that the evidence is conflicting or that it is evenly balanced, then the findings will not usually be disturbed. *Columbia Lbr. Co. v. Bush*, 13 Wn. (2d) 657, 126 P. (2d) 584; *Fisher v. Hagstrom*, 35 Wn. (2d) 632, 214 P. (2d) 654.

Appellant recognizes the above rule, but argues that the evidence clearly preponderates against the findings of the trial court and that the true nature of the transaction between appellant and respondent was that of a purchase and sale agreement. After reviewing the testimony, appellant in his brief states his position as follows:

"The appellant frankly concedes that on this state of the record, normally the burden of proof would be satisfied and the preponderance of the evidence would support a finding in favor of the respondent, but we desire to now

detail further undisputed facts which we strongly feel completely change the picture."

In support of this contention the appellant states that if the trial court's findings are to be sustained, every document and every act on the part of appellant, his wife, respondent and his wife, made and done prior to the spring of 1948 must be held to be false and fraudulent; whereas, contrary findings would be consistent with honest actions and motives.

Conceding *arguendo* that appellant's position has some merit, nevertheless the mere fact that respondent and appellant may have been actuated by false and wrongful motives in entering into their arrangement is immaterial upon the basic question of the ownership of the stock. We have carefully reviewed all of the testimony and the documentary evidence in this case and find that respondent, while willing to do anything the company required which would enable the parties to carry out their stock-working arrangement unknown to the company, at no time entered into an agreement to sell the stock.

The trial court very aptly summarized the inherent improbability of appellant's testimony as follows:

"In the first place when this stock was allegedly purchased there was no claim by this plaintiff that he kept any account, that there was any agreement or contract except an oral one. A most unusual circumstance. He said that interest was supposed to be—or words to that effect—six per cent. There was no computation of interest on any of these papers put in evidence here.

. "He says the amount to be paid was $40.00 a month, about $40.00 a month. I can give you his language on that —said that $40.00 a month would be about right. Later on the amounts were computed on some kind of basis where the tax was deducted. Everything about it contradicting any idea of an outright purchase, at a certain amount a month, but certainly supporting some idea of the division of the earnings of that man.

"The conversations between the parties, as detailed by the plaintiff, as to the purchase of this stock are so unusual as to just completely discredit them, in my opinion. To think that Mr. Todd would come over to his front yard,

Mr. Paddock's front yard, and say, 'Would you like to go to work at the Anacortes Veneer and buy some stock?' Mr. Paddock has no money at all. 'Would you like to go to work and buy some stock?' If the stock had a market value of $4,000.00 at that time, why couldn't it have been sold to somebody else for $4,000.00, or some amount? No down payment. No contract. No computation of interest on the unpaid balance. Exhibit 5, if you will take a look at that, makes no mention of unpaid balance. The plaintiff kept no figures except these slips. He didn't seem to know when the stock was paid up.

"The whole thing is so open to conjecture and speculation. And then, Mr. Walthew, I might say that more basic than all those points, in my judgment, is the demeanor of the plaintiff on the witness-stand in his answers, which, in my judgment, completely refute his story."

■ From our independent examination of the evidence, we cannot conclude that the trial court erred in entering its findings of fact and conclusions of law and in dismissing appellant's action. The preponderance of the evidence supports its holding that respondent is the owner of this stock and we accordingly affirm the judgment and decree upon appellant's original appeal.

We now consider appellant's appeal from the denial of his motion for vacation of the judgment and in the alternative for a new trial. This motion was argued some ten months after the entry of the judgment and decree. In support of his motion, appellant presented to the trial court, as newly discovered evidence, a letter and an affidavit. The letter dated January 12, 1944, addressed to respondent, read:

"Dear Mr. Todd:

"Our records show that George R. Paddock obtained twenty shares of Anacortes Veneer Stock from you. If he purchased these (not lease or rent) will you please sign the enclosed affidavit and have it notarized.

"Sincerely yours

/s/ C. H. King

C. H. King

Anacortes Veneer Inc.

Anacortes, Washington."

In compliance with this request, respondent on January 14, 1944, signed the following· affidavit:

"LeRoy Todd, being first duly sworn states that he is a resident of Anacortes, Washington; that on the 31st day of December, 1943, he was the owner of record of 20 shares of the stock of ANACORTES VENEER, INC., a Washington corporation, represented by stock certificate(s), No. 654; that on said 31st day of December, 1943, affiant (sold) said stock to George R. Paddock; who thereupon became the sole legal and equitable owner thereof; and that affiant has not retained any interest in or right to said stock and has not entered into any arrangement or understanding with said George R. Paddock whereby affiant would receive or become entitled to any payment or other benefits from said George R. Paddock on account of the transfer of said stock, other than the agreed purchase price, if any.

"Affiant further states that this affidavit is made and executed at the request of ANACORTES VENEER, INC. for its benefit and protection, and constitutes a representation to said company that the facts hereinbefore stated are true and correct in all respects."

 The issue presented is whether the above newly discovered evidence was of such character as to require the vacation of the judgment and decree or the granting of a new trial to appellant. The character of such newly discovered evidence has been frequently considered by this court and the various elements essential to the granting of a new trial upon that ground have been defined. In *Nelson v. Placanica,* 33 Wn. (2d) 523, 206 P. (2d) 296, this court said:

"To justify granting a new trial on the ground of newly discovered evidence, the following requirements must be satisfied: (1) The new evidence will probably change the result if a new trial is granted. . . . (2) It must have been discovered since the trial. (3) It could not have been discovered before the trial by the exercise of diligence. . . . (4) It is material to the issue. . . . (5) It is not merely cumulative. . . ."

See, also, *Chadwick v. Ek,* 5 Wn. (2d) 554, 106 P. (2d) 104.

The trial court was of the opinion that elements two, three and four, as set forth above, existed in this case but

that, if this evidence had been presented at the trial, it would not have affected the result and also that it was merely cumulative.

There is no doubt that the statements contained in respondent's affidavit of January 14, 1944, are in direct contradiction of his testimony in this case concerning the main issue, to wit, whether there was a sale of the stock or a working agreement. Either respondent's affidavit was false or his testimony was false. If the affidavit were in evidence, it would be the duty of the trial court to determine in which instance respondent spoke the truth.

Respondent's testimony at the trial as to the nature of the transaction was corroborated by disinterested witnesses. Appellant's testimony was not corroborated. This affidavit, if in evidence, would support his testimony, but it would not change the result because it was made by respondent clearly in furtherance of the conspiracy entered into by the parties in order to obtain money from the Anacortes Veneer, Inc., by means of false affidavits. Appellant's affidavit to the same effect was admitted in evidence.

In commenting upon this and other documents introduced in evidence by appellant the trial court said:

"The Court: That was necessary, of course, to obtain employment. If that had not been signed, he could not have gotten a job. Mr. Walthew: But your Honor can't presume a solemn declaration is made falsely. There is no evidence that it was made falsely. The Court: No. I don't presume that it was; nor do I presume that it was made truthfully, in view of other circumstances in this case. That is that one bit of evidence standing by itself. But it certainly by itself does not establish definitely that there was a sale of this stock. Mr. Walthew: In and of itself, of course, it isn't sufficient. It is also significant as evidence here that according to the testimony so far Mr. Todd went down with him and had this signed. The defendant was present at that time. The Court: I don't doubt a bit but what there was a conspiracy here to put somebody to work who was not entitled to, and I don't doubt a bit but what Mr. Todd entered into that if he knew at that time of the regulations of the company. And it is rather difficult for me to believe

that a lawyer in a town of the size of Anacortes who owned twenty shares of stock in this concern wouldn't know about it. He did admit it was possible."

Even if all respondent's testimony as to the character of the transaction should be disregarded entirely, there was sufficient credible evidence in this case to sustain the finding that there was no sale of this stock. The effect of admitting respondent's affidavit would only have been to enable appellant to attack respondent's credibility and attempt to show that he had committed perjury. For the reasons stated, this would not have changed the result. The trial court did not abuse its discretion in denying appellant's motion to vacate the judgment and decree and for a new trial. See *State v. Adams,* 181 Wash. 222, 43 P. (2d) 1.

Concerning respondent's cross-appeal, little need be said. It is very clear that the trial court, in exercise of its equitable powers, was entirely correct in refusing respondent any relief upon his cross-complaint for the reason that both appellant and respondent knowingly entered into a conspiracy to obtain money from Anacortes Veneer, Inc., by falsely representing that appellant was a *bona fide* stockholder and, as such, entitled to employment under the rules and regulations of the company. Under these circumstances, the parties being in *pari delicto,* a court of equity will not aid either party in carrying out their fraudulent conspiracy. 2 Pomeroy's Equity Jurisprudence (5th ed.) 134, § 402f.

The judgment and decree of the trial court is affirmed on each of appellant's appeals and, also, upon respondent's cross-appeal.

BEALS, MALLERY, SCHWELLENBACH, and HILL, JJ., concur.