[No. 25214.   Department Two.   March 26, 1935.]

THE STATE OF WASHINGTON, *Respondent,* v. W. W.
ADAMS *et al., Appellants.*[1]

[1]Reported in 43 P. (2d) 1.

*Hughes & Hughes,* for appellant Adams.

*Hanna & Gemmill,* for appellant Bossie.

*J. A. Adams* and *Sam M. Driver,* for respondent.

STEINERT, J.—The appellants above named and one Charles Whisnand were charged by information with unlawfully and feloniously opening, conducting, carrying on and operating a gambling game commonly known as stud poker. The trial came on before the court and jury, and at the conclusion of the state's case each of the parties defendant moved that the case be dismissed as to him. The motion of Whisnand was granted; the motions of Adams and Bossie were denied. The trial proceeded against the latter two and resulted in a verdict of guilt against each of them. Their respective motions for new trial having been denied, sentence was imposed and judgment was entered, from which they have appealed. The two defendants who were convicted will therefore be referred to herein as appellants.

By their assignments of error, each of the appellants questions the sufficiency of the evidence to make a case, or to sustain the verdict, against him. Appellant Adams further assigns as error the refusal of the court to give certain requested instructions, and the refusal to grant a new trial because of newly discovered evidence.

Rem. Rev. Stat., § 2469 [P. C. § 8926], under which appellants were charged, reads as follows:

"Every person who shall open, conduct, carry on or operate, whether as owner, manager, agent, dealer, clerk or employee, and whether for hire or not, any gambling game or game of chance, played with cards, dice, or any other device, or any scheme or device whereby any money or property or any representative of either,, may be bet, wagered, or hazarded upon any chance, or any uncertain or contingent event, shall be

a common gambler, and shall be punished by imprisonment in the state penitentiary for not more than five years.''

The facts, as the jury was warranted in finding them, are as follows: Appellant Bossie conducted a restaurant business, known as the Black and White Restaurant, in the northerly half of the Ellis building, which is located on the westerly side of Mission street in Wenatchee. The southerly half of the building was occupied by another tenant, the Maytag Washing Machine Company. Back of the restaurant is a kitchen, and back of that is a hallway extending along the width of the building. Underneath the building is a basement, which, however, does not extend entirely to the front or to the rear of the building, nor does it have windows. Access to the basement is gained by means of a stairway just outside of the kitchen and leading downward underneath the restaurant premises.

At the foot of the stairway is a corridor running forward several feet toward the front of the building, and ending at a hallway running along the width of the building. Beyond this hallway toward the front, or east side, of the basement are three rooms, designated, respectively, a furnace room, a refrigerating room, and a storage room. The first two of these rooms are underneath the restaurant; the storage room is almost entirely, if not wholly, underneath the store occupied by the Maytag company. These rooms were not kept locked. While the storage room was not covered by Bossie's lease, he nevertheless had access to it and made use of it for storage purposes. Opposite the head of the stairway and back of the kitchen is a door opening upon an alley in the rear of the building. The Maytag store did not keep open at night, and, when closed, all its doors through which access to the basement might be had were locked.

Prior to September 17, 1933, the police obtained information that gambling was being maintained in the basement underneath the Black and White Restaurant. Men had frequently been seen going through the alley at night and being admitted through the back door of the restaurant. Occupants of the kitchen could, by looking out of the windows, observe those who sought admission. Gambling had, in fact, been going on at the place for several months.

On the night of September 17th, between eleven and twelve o'clock, a squad of police and deputy sheriffs, armed with a search warrant, raided the place. Several of the officers entered the restaurant, went through the kitchen and down the stairway, while others crashed in the door opening from the alley in the rear and proceeded down the same stairway.

In the storage room, a game of stud poker was in progress. There were two, or possibly three, tables in the room, at one of which five or six men were playing. There were, all told, fifteen or sixteen men in the room, most of whom had entered the place through the restaurant. Those who were not playing were either watching the game, or else were reading or lying down. The tables had come from the Black and White Restaurant and were of the same kind as those used therein, except that a crescent-shaped segment had been cut from the rim of each large enough to admit the front of a man's body. The tables were covered with cloths, and underneath each at the place where the segment had been cut out was a drawer, in which cards and poker chips were kept.

Appellant Adams was seated at the active table, at the place of the indentation, with a large stack of poker chips in front of him. He had been seen at the place on frequent occasions taking part in the games. While playing, he had, from time to time, sold poker

chips to other players. He admitted that he had been gambling at the time. Appellant Bossie had also been seen playing there on several occasions, but at the time of the raid was in the restaurant.

On the wall of the storage room was a small cabinet, in which decks of cards, poker chips and other articles were stored. This cabinet was kept under lock and key. At the time of the raid, and on demand of the officers, Adams produced and delivered the keys to one of the police.

■ These facts, in the light of the surrounding circumstances, were, in our opinion, sufficient to take the case to the jury and to sustain the verdict rendered as to each appellant. The object of the statute above quoted is to suppress gambling resorts and prevent the maintenance and operation of gambling games. *State v. Gaasch,* 56 Wash. 381, 105 Pac. 817; *State v. Manolis,* 127 Wash. 597, 221 Pac. 326; *State v. Smiley,* 167 Wash. 342, 9 P. (2d) 370.

■ Bossie's connection with the operation of the gambling games was sufficiently established, as the jury might have found, and obviously did find, from these facts: Gambling had been conducted for a long time, and was in actual progress upon the particular occasion, on premises to which he had immediate access and which he was, at least, privileged to use. The games were conducted in a clandestine manner and place. Resort to the place was had regularly and for the most part through premises over which he had exclusive possession and control. The only other avenues of ingress and egress were also under his control and direction, particularly at night, when the place was most often frequented. Those admitted to the place were under the observation of himself or his employees. It would have been impossible to operate the resort at night unless his premises were used. Some of the

paraphernalia, at least, came from his restaurant. He himself took part at times in the games played.

Proof of proprietorship in the conduct or operation of gambling is not always capable to the point of ocular demonstration or by the direct testimony of witnesses. Nor is it necessary that the proof go to that extent. All that is required is that the evidence and the circumstances be such that the guilt of the accused may be fairly inferred, under the rule requiring that guilt be established beyond a reasonable doubt. *State v. Nickerson,* 153 Wash. 160, 279 Pac. 401.

In *State v. Everitt,* 127 Wash. 265, 220 Pac. 797, in which the defendant was convicted upon a charge founded upon the same statute as that here involved, this court said:

"But from the fact that the arrangements seem to have been made for the purpose of conducting a clandestine game; that the paraphernalia was furnished therefor; that a large number of persons resorted to a very small room to engage therein; that some money was found in front of the person who was dealing the cards, and that appellant occasionally looked in upon the game, the inference might justly be deduced by the jury that appellant was the owner and proprietor of the game, and the dealer his operating agent. While it is true that the evidence is slight and is contradicted, we think it is sufficient to take the case to the jury. Even though a conviction of felony in such a case may seem harsh, we have no right to invade the province of the jury when there is any evidence and circumstances from which the guilt of the accused might be fairly inferred [citing cases]."

If we should substitute the words "poker chips" for the word "money" in the above quotation, its language might well be spoken of the case now before us.

Adams' connection with the operation of the games was sufficiently established, as the jury might have found, and obviously did find, from these facts: He

was at the place many times; on such occasions he participated in the gambling; frequently, other players purchased poker chips from him; on the particular occasion, he was seated at the place where the operator of the game would be expected to sit; he had a large stack of poker chips before him at the time; he produced and surrendered the keys to the cabinet and drawers.

We conclude that the evidence, though conflicting, was sufficient to take the case to the jury; and the trial court having thereafter refused to grant a new trial, we can not, except for manifest abuse of discretion by the court, which does not here appear, reverse the action of both the court and jury, regardless of what our opinion as to the weight or preponderance of the evidence may be. *State v. Jakubowski*, 77 Wash. 78, 137 Pac. 448.

The next assignment of error is predicated upon the refusal of the court to give certain requested instructions.

Appellant Adams proposed three instructions, the gist of which was to the effect that one who merely plays or sits in a gambling game, or who merely has in his possession gambling paraphernalia which is kept or permitted to be kept in a place where gambling is conducted, may not, on such evidence alone, be convicted of the crime of opening or conducting a gambling game. Assuming for the purpose of the argument that the requested instructions were correct statements of the law, we are of the opinion that appellant Adams was not prejudiced by the refusal to give them. In its instructions, the court very carefully and clearly defined the offense with which appellants were charged, namely, that of opening, conducting, carrying on or operating a gambling game. In the same instruction containing the definition of

the offense, the court specifically charged the jury that it did not include the crime of mere gambling or the crime of permitting a building to be used for gambling; further, therein, the court instructed the jury that the object of the statute under which appellants were charged was to suppress gambling resorts or places where gambling is carried on and to punish those who maintain such places, as contra-distinguished from the objects of those statutes which aim only at the punishment of participants in gambling games or those who permit premises under their control to be used for such purposes. The requested instructions merely emphasized the thought that the court had already adequately expressed. There was no error committed in refusing to give the requested instructions.

The final assignment of error is based upon the refusal to grant a new trial because of newly discovered evidence. Appellants offered a series of affidavits, the purpose of which was to show that defendant Charles Whisnand, who had been dismissed at the conclusion of the state's case, was, in fact, the person who had purchased the tables and cabinet and who, presumably, was the proprietor of the place. The evidence suggested by the affidavits was, we think, merely cumulative to, and corroborative of, the evidence submitted by the appellants at the trial. By fixing the responsibility upon Whisnand, the affidavits sought to show affirmatively that the appellants were not the responsible parties. Almost four months elapsed between the filing of the information and the time of trial. The rule is now settled in this state that, to warrant the granting of a new trial on the ground of newly discovered evidence, it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been dis-

covered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. *Libbee v. Handy,* 163 Wash. 410, 1 P. (2d) 312; *Smith v. Kneisley,* 175 Wash. 29, 26 P. (2d) 387.

It is also the rule that the granting of a new trial upon the ground of newly discovered evidence, whether cumulative or not, is peculiarly within the discretion of the trial court, and the exercise of that discretion will not be disturbed except for manifest abuse. *Molitor v. Blackwell Motor Co.,* 112 Wash. 279, 191 Pac. 1103; *DeRosier v. Standard Oil Co.,* 166 Wash. 670, 8 P. (2d) 296. The court exercised its discretion in the matter, and its ruling indicates that it found that one or more of the necessary elements in the consideration of newly discovered evidence was lacking. It does not appear to us that the court abused its discretion. We therefore can not interfere with the court's ruling.

The judgment is affirmed.

BLAKE, MAIN, MITCHELL, and HOLCOMB, JJ., concur.