[No. 30170. Department Two. July 24, 1947.]

THE STATE OF WASHINGTON, *Appellant,* v. HAROLD THEODORE BRENT, *Respondent.*[1]

[1] Reported in 183 P. (2d) 495.

*Alden B. Whelan,* for appellant.

*Edwards E. Merges,* for respondent.

ROBINSON, J.—On August 17, 1946, Harold Theodore Brent shot and killed Donald Caldbick at the Caldbick home

near Oak Harbor, Island county, Washington. On November 21st, at the close of a long trial, a jury found Brent guilty of murder in the second degree. This appeal is from an order entered January 28, 1947, granting a new trial.

■■ During oral argument here, respondent's counsel repeatedly and vehemently asserted that a full and complete examination of all the evidence would inevitably convince any court that the conviction of his client was the sole and proximate result of an unlawful conspiracy between the relatives of Donald Caldbick, their friends, and various officials of Island county. All of the oral evidence, comprising some eight hundred fifty pages of the statement of facts, has been carefully read and examined, much of it checked and rechecked, and the twenty exhibits have been inspected. In our opinion, no unlawful conspiracy is shown or even indicated. To convict one of a crime is not an unlawful end, and persons who in good faith collaborate in an effort to do so are not unlawful conspirators unless they employ unlawful means.

The specific legal questions presented for our decision are such that a comprehensive recital of the evidence is not required. However, the highlights must be stated to establish the requisite background.

At the time of the tragedy, Mrs. Caldbick, an elderly widow, affectionately called "Granny" by her intimate friends, had, for a considerable period, lived in a hill-top house near Oak Harbor. Her son, Donald Caldbick, then about thirty-one years old, had lived with her intermittently, and continuously for several months, before he was killed. She owned a small cottage located at the foot of the hill, about two hundred feet from her home, which, for some months, had been occupied by Harold Brent and his wife. Mrs. Caldbick and the Brents had become very close friends, and so, as Brent testified at length, had he and Donald Caldbick.

On August 17, 1946, the Brents were expecting guests, and Donald had been helping Brent clean up around the Brent premises, not, as we understand it, working for hire, but as a neighborly accommodation. During the course of

the work, each of them had two drinks of some sort of a rum mixture concocted by Mrs. Brent, and in the late afternoon they drove to a tavern in nearby Oak Harbor and there consumed a limited quantity of beer.

According to the Brents, on the way home from Oak Harbor, Caldbick became critical and quarrelsome concerning Brent's driving. They testified that, upon arrival at the cottage, Caldbick, suddenly and without warning, dragged Brent out of the car and began to beat him. Carol DeVries, a neighbor who was working in his nearby yard, testified, however, that, when the car stopped, Caldbick took a box out of the car and started up the hill toward his home. Brent got out of the car and started chasing Mrs. Brent up the road, and, as he overtook her, struck her, whereupon Caldbick dropped his box, ran back, and attacked Brent, Mrs. Brent standing by and crying out: "Beat him up good; he deserves it," but, as the beating progressed, begging him to lay off.

(In a memorandum opinion ruling upon the motion for a new trial, the trial court said that: "The jury was fully warranted in believing every word of the testimony of Carol DeVries,—Carol and Martha DeVries.")

Whatever the fact may be as to the start of the quarrel, it is certain that Caldbick, who was larger and stronger than Brent, gave him a terrific and unmerciful beating, knocking him down and repeatedly kicking him in the face and body with his heavy work shoes. Caldbick finally turned and ran up the hill towards home. The Brents testified that, as he ran, he shouted that he was going to kill everybody on the Caldbick hill, and, knowing that his mother was at home, they began to cry out, "Granny, Granny, Granny." That they did so cry out is corroborated by both Carol and Martha DeVries, and, as will be later seen, the established fact that they did so cry out may well be regarded as the cornerstone of Brent's defense.

As Caldbick started to run up the hill, Brent hurried into his cottage, got his single-barreled shotgun, and pursued him, and, as Caldbick was about to reach the shelter of his house, fired. The shot tore Caldbick's right hand and his

right ear, and stray pellets were lodged in his head, back, and right knee. According to the testimony of his mother, he burst into the house, crying out: "I've been shot, mother. Harold shot me." She took him into the laundry room and washed the blood from his hand, from which the tips of two fingers had been shot away. Mrs. Caldbick testified that, after this had been done, Donald went into his closet and got a shotgun, and said: "Harold is beating Pat [Mrs. Brent] up. He can't do that. I'm going to kill him."

She took the gun away from him and laid it across the laundry tray, where it remained until after the tragedy. It was not loaded, although there were a number of boxes of shotgun shells in the closet from which he procured it.

It appears that, at about that time, Brent entered the Caldbick house. Mrs. Caldbick told him to go into her bedroom and stay there, and that she could handle Donald. He obeyed her request. She then telephoned Mrs. DeVries, asking her to send her husband over. While she was telephoning, Donald evidently went out of the house; for, as DeVries answered the summons, he met him running down the hill. He was unarmed. DeVries testified:

"He was running, hollering, 'I'm going to kill you; I'm going to kill you.' He got about, I would say, 30 feet from me and I says, 'Don, what's the matter with you? Behave yourself.' He stopped, turned around and ran back into his own home."

DeVries testified that he followed him at a slower pace, and, when he entered the living room, "Mrs. Caldbick had Don sitting on the little stool which sits right in front of the fireplace." They were talking, but he did not hear what they were saying. Mrs. Caldbick stepped into the kitchen and nodded to DeVries to come out there, which he did. She said, "I've got Harold shut up in the bedroom. Everything will be all right. You go to the phone and call for help." DeVries encountered the obstacles commonly met with on a rural party line, and "rang and rang and rang." Then he heard a shot and hurried out to the living room, Mrs. Caldbick preceding him. She went to the front door. Donald was lying on the porch just outside. She cried out,

" 'Oh, he's killed him, he's killed him.' Brent then came across the room and offered me his shotgun."

Obviously, Donald must have gone outdoors when DeVries and Mrs. Caldbick were trying to telephone. Brent, according to his own testimony, had remained for a little while in Mrs. Caldbick's bedroom and had then gone into another room, and, as we understand the evidence, had then gone to a small hall-like room which had a door opening into the living room. From this door he could see the door through which one would enter the house from the front porch. While he was standing in that interior doorway, or looking out of it, Caldbick opened the living room door, put one foot over the threshold, and Brent shot him while he was thus entering the house.

On the night of the killing, Brent told his story to Raymond Nelson, a deputy sheriff, how he and Caldbick were working, the drinks they took at home, the trip to Oak Harbor, the beating, his going up to the Caldbick house, the shooting of Caldbick as he entered the front door, and so forth, but said nothing whatever about having fired the first shot. Nor did he mention it in making a similar detailed statement to the prosecuting attorney later on the same evening. However, upon an examination of Caldbick's body at the undertaking parlors late that night, it became indisputably evident that he had been shot at least twice. While telling his story to the sheriff on Monday, Brent said that he had until then forgotten, or could not remember, firing the first shot, and even at that time could not remember pulling the trigger.

At the trial, the respondent gave the following testimony as to the second and fatal shot. When standing in the little hallway room commanding the entrance into the living room from the porch, he looked out from time to time, opening the door about six inches.

"A. I heard a scuff, and I glanced up and Don was running on the porch towards me, and, as he stepped across the doorway here, he says, 'I'm going to kill you, you son-of-a-bitch.' I looked him right in the face, and I turned and I shot him. Q. What was your state of mind at the time you

shot Donald Caldbick? A. I thought he was going to do just exactly what he said he was going to do. I thought he was going to kill me. Q. Did you know whether or not he had a gun? A. I did not. All I seen was his face and shoulders."

On cross-examination, he testified, in part, as follows:

"A. The minute I heard the scuffing, I looked out the front door. Q. And saw Don coming in the front door? A. He was running in the front door. Q. And he came right straight toward you? A. Well, he was coming right straight at me, Mr. Dailey. I wouldn't say straight. I don't know. I couldn't describe his— Q. He didn't have his hands up? A. All I seen was his face. Q. All you saw was his face? You don't know whether he had any weapon or not? You didn't Saturday. A. I do not know. Q. You know now he didn't, don't you? A. I know now he didn't— Q. You knew immediately afterward, he didn't? A. I went out and looked, sir. Q. He was in the act of coming in the door when you shot? A. Running in the door. . . . Q. And how far away from him were you then? A. At what time, Mr. Dailey. Q. The time he said, 'I'm going to kill you.' A. Just as he stepped from the porch into the house. Q. He said that as he stepped from the porch into the house? He had seen you then before he came in the house, you think? A. He must have heard me; I wouldn't say. I couldn't say about whether Don seen me or not."

Deputy Sheriff Nelson, who took a comprehensive statement from Brent on the night of the killing and was the first witness called at the trial, had previously testified that Brent had told him that young Caldbick came through the front door of the house "with his hands in a lunging position."

"Q. What followed then? A. Brent told me Caldbick looked like a madman as he came through the door. I said to Brent, 'Did you shoot him then?' He said, 'Yes.' I said, 'Was there anything in young Caldbick's hands when he came through the door?' He said, 'Nothing.' I said, 'Did he say anything after you shot?' He said young Caldbick said, 'He got me.' "

■ The foregoing recital, of necessity, omits a great deal of evidence which is favorable to the respondent, and also much which is favorable to the state. It must be remembered that it is not our duty or province to decide whether the respondent was innocent or guilty. That was the func-

tion of the jury, and the jury has said he was guilty. Our function is to decide whether or not he had a fair trial, and we have dealt only with such highlights of the evidence as are required to throw into relief the basic factual issues.

The following facts were indisputably established: Brent and Caldbick engaged in a fight in which Brent was very severely beaten. Caldbick fled from the scene. Brent was, however, able to procure his shotgun and pursued him. He shot and wounded Caldbick just as he was about to enter his home. Some few minutes thereafter, Brent entered the Caldbick house with his loaded shotgun and, after another interval of a few minutes, encountered Caldbick and killed him on sight. Brent was, therefore, put to his defense, and he obviously had much to excuse and explain. Briefly, his position was that he fired the first shot in an effort to prevent Caldbick from killing his own mother, that he followed Caldbick into his own home for the same meritorious purpose, and that, while therein, he was surprised by Caldbick, under such circumstances that he was compelled to kill him in order to save his own life, or at least to save himself from grievous bodily harm.

The greater part of the long statement of facts is concerned with respondent's attempt to support the above-stated position or positions. Donald Caldbick's reputation for being quarrelsome and violent when drunk was inquired into at great length, and his general reputation was inquired into as far back as his prep school days. Police and detectives were summoned from the city of Everett, where he had lived for a period ending at least four years before the tragedy, to testify that he was reputed to be mean and quarrelsome when drunk. Naval shore police were called to testify that he had that reputation around Oak Harbor. In fact, it was contended that Donald Caldbick was such a violently dangerous character that the Caldbick family and their friends and neighbors were pleased and delighted at his taking off.

As to the matter last mentioned, Mrs. Brent was the principal witness. We quote briefly from her testimony. Speaking of her first meeting with Mrs. Caldbick after the killing

of her son, which occurred very shortly after the event, Mrs. Brent testified that Mrs. Caldbick exclaimed: "This is the answer to my prayers." Speaking of Donald's sister Helen (Mrs. Woodsmith), Mrs. Brent testified as follows:

"I think it was Helen that came, and, when she came in, I think I was the first one to greet her, and she says, 'Where's mother?' and I said, 'She's sitting over there in the living room,' and she went over to her mother and gave her a kiss, and then, I was crying, and she came right to me and sort of took me by the shoulders and shook me, and says, 'Now, stop it. Our worries are over. Now stop it.' And she went over to Harold and put her arms around Harold and gave Harold a kiss on the forehead."

While on the witness stand in his own defense, the respondent had the following to say as to the attitude of the Caldbicks and their friends who assembled at the Caldbick home the night of the tragedy:

"Well, after all this happening and everything, these people seemed to think it was a great thing that Don was gone. They said they expected Don to blow—had expected him to do something and kill his mother—what a wonderful thing I had done. I don't know, I couldn't see their point."

Much emphasis is placed upon the fact that Brent was not arrested that night (August 17th) and not until two days later, and that the Brents were invited to meals and otherwise entertained at the Caldbick home during that interval. There is, in fact, a great deal in the record tending to support the position taken by the defendant at the trial, and yet it is one of the mysteries of the case that, despite the apparently wide and thorough search—extensive as to both time and space—for evidence to prove that Donald Caldbick was reputed to be a violently homicidal character, no evidence whatever was adduced that he ever physically injured anybody prior to his assault on Brent, or was ever convicted of an assault on anyone, or even arrested on any kind of a charge. Nor was there any evidence that he ever struck or offered any violence to any member of his family unless the following can be considered to be such. When Mrs. Caldbick was called to the

stand by defendant as an adverse witness, she testified, in part, as follows:

"Q. Did you ever tell the defendant or Mrs. Brent that Don hit his sister, beat her up? A. Well, they had scraps, like any brother and sister. He didn't beat her up any more than she beat him up. Q. Did you tell Mr. and Mrs. Brent that Don and his sister had a fight where blows were exchanged then? A. Well, how do you have a fight if you don't have blows? Q. Well, you and I are doing pretty well now. Will you answer the question, please, Mrs. Caldbick. A. Well, yes. Q. Did you tell them? A. They did strike each other. Q. Did you tell Mr. or Mrs. Brent that Helen came out of the fight with a couple of black eyes? A. I don't think so. Q. Could it have been one black eye? A. I doubt it. Q. Is it possible? A. I don't think she had a black eye, that I remember of. Q. Did she suffer any injuries at all? A. Not that I know of."

In the trial court's decision on the motion for a new trial, we find a comparatively long analysis of the evidence, preceded by the introductory sentence: "On the facts, this case was a very close one," and ending with the following sentence: "While it isn't up to me as a trial judge to say what my decision would have been had I been the trier of the fact, it is sufficient to say that it was very close."

After a thorough examination of all the evidence, we are of the same opinion. The trial court carried this thought into the order appealed from by saying, as introductory to the directory portion thereof:

"The court being further of opinion that on the facts the case was very close, and a jury composed of conscientious and reasonable people might well conclude that the homicide was justified;

"It is therefore ORDERED, ADJUDGED and DECREED, etc."

■ With that introductory statement we also agree, but in that connection we have in mind a rule as old as the jury system. The rule was accurately stated by the trial judge in an instruction given to the jury in this very case:

"You are further instructed that you are the sole and exclusive judges of the weight and credibility to be al-

lowed the testimony of the several witnesses, both for the State and for the defendant." Instruction No. 17.

The motion for a new trial was based on specific statutory grounds:

"Comes now the defendant and moves the court for the entry of an order granting the defendant a new trial upon the following grounds and for the following reasons:

"(1)   Irregularity in the proceedings of the court, jury, and abuse of discretion, by which the defendant was prevented from having a fair and impartial trial.

"(2)   Accident or surprise which ordinary prudence could not have guarded against.

"(3)   Newly discovered evidence, material to the defendant, which could not with reasonable diligence have been discovered and introduced at the trial.

"(4)   Insufficiency of the evidence to justify the verdict, or that it is against law.

"(5)   Error in law occurring at the trial and excepted to at the time by this defendant."

The directive part of the order granted the motion on two specific grounds:

"The court being further of opinion that on the facts the case was very close, and a jury composed of conscientious and reasonable people might well conclude that the homicide was justified;

"It is therefore ORDERED, ADJUDGED and DECREED that the defendant's motion for new trial be and the same is hereby granted upon the following grounds:  1. Error of law occurring at the trial; 2. The verdict is contrary to the law and evidence."

■ The state contends that the order is not sustainable on either of the grounds assigned. We will discuss the second ground first. It is our opinion that the trial court erred in granting a new trial on the ground that "the verdict is contrary to the law and evidence." It is further our opinion that the court was led into error by an inadvertent mistake of respondent's counsel, ultimately chargeable to the antiquity of our current code.

Section 399 of vol. 2, Remington's Revised Statutes 389 [P.P.C. § 47-17], entitled:  "New trial—Grounds for grant-

ing," lists eight grounds, of which the seventh reads as follows:

"7. Insufficiency of the evidence to justify the verdict or the decision, or that it is against law."

By reference to the motion for a new trial (above quoted in full), it will be seen that the fourth ground therein assigned reads as follows:

"(4) Insufficiency of the evidence to justify the verdict, or that it is against law."

That is the ground authorized by ground 7 of § 399, as it appears in vol. 2 of Remington's Revised Statutes. A long list of decisions can be readily found in the digest holding that that statutory language gives the trial courts a very broad discretion in the matter of granting new trials for insufficiency of the evidence. Some of these decisions go so far as to give the appearance of conflict with the long-established rule that the jury is the sole and exclusive judge of the weight and credibility of the evidence. However, we are not concerned with those decisions; for the 1933 legislature revised and rewrote § 399, and, in doing so, struck ground 7, as it appeared in vol. 2, of Remington's Revised Statutes, and substituted therefor the following:

"7. That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law." Laws of 1933, chapter 138, p. 482; Rem. Rev. Stat. (Sup.), § 399.

That is the existing law governing the granting of new trials on the ground of insufficiency of the evidence, and it is the language respondent's counsel should have used in stating his ground (4). Had he done so, it is apparent that the trial court would not have granted a new trial on that ground.

As we have heretofore stated, the order appealed from reads, in part, as follows:

"The court being further of opinion that on the facts the case was very close, and a jury composed of conscientious and reasonable people might well conclude that the homicide was justified;

"It is therefore ORDERED, ADJUDGED and DECREED, etc."

We will not here undertake to state or define the exact effect of the change in the statutory language of ground 7 made by the 1933 act. It is sufficient for our present purpose to point out that it would be clearly impossible to follow the above introductory statement with a finding that there was no evidence or reasonable inference from evidence to justify the verdict.

The order expressly recites, however, that the verdict is contrary to law. We take it that this means contrary to the law of the case, as set forth in instructions. We have examined the thirty-nine instructions which were given to the jury, and have found they cover every point in the case, that they are clear and accurate and wholly devoid of anything of which the respondent could reasonably complain. The pivotal instruction on self-defense is especially accurate and comprehensive. It happens that the soundness of the instructions given is indicated by an occurrence which, considering the length of the trial, the volume and complexity of the evidence, and the nature of the case, it seems to us, must be regarded as extraordinary, if not unprecedented. After the jury had been instructed, Mr. Beeler, on the part of the defendant, took exception to the court's failure to give certain requested instructions, whereupon the following occurred:

"THE COURT: May I ask, do you have any exceptions to the instructions which were given? MR. BEELER: No. . . . THE COURT: . . . (To Mr. Whelan) Do you have any exceptions? MR. WHELAN: No."

We can find no reason to suppose that the members of the jury in any way overlooked or disregarded the law as given to them by the court.

We come now to the other, and we believe the main, ground upon which the order appealed from was granted: "(1) Error of law occurring at the trial." This expression is general, but what matters the trial judge had in mind are unmistakable from the record. He was confronted with a set of circumstances so unusual that the matter can only be dealt with at considerable length.

Island is a relatively very small county, as may be realized by comparing its total land area, 208 square miles, to that of Okanogan county, which has 5,295 square miles. Its population, according to the 1940 census, was but 6,098, and, according to the records of the secretary of state, was estimated in 1946 to be 7,300. There were but two lawyers practicing in the county at the time of the tragedy, Alden B. Whelan, the prosecuting attorney, and James Zylstra. Zylstra was sixty-nine years of age, and some years before had ceased engaging in trial work. At the very beginning of the trial, and before the jury was impaneled, the following occurred:

"MR. WHELAN: After the jury has been picked, Mr. A. E. Dailey of Everett will be my assistant in this case. THE COURT: Very well. Mr. A. E. Dailey of Everett will be of counsel, will be one of the counsel for the prosecution."

No objection was made by defendant's attorneys. Mr. Dailey appeared at the trial as an assistant prosecuting attorney on the morning of the third day and served as such until the case went to the jury.

The respondent's motion for a new trial was argued on January 9, 1947. At the close of the argument, the trial judge stated to counsel that he had reason to believe that Mr. Dailey might have been in the employ of Mrs. Caldbick, adding:

"I regard it as very serious if actually Mr. Dailey was employed by Mrs. Caldbick and such fact was not revealed to the court, counsel and the jury, and I will give both sides an opportunity to make a showing on these matters which I have suggested."

As a result, and at respondent's request, but over appellant's objection, a number of witnesses were summoned to appear in court on a day set and were orally interrogated at considerable length, first by the court, then by Mr. Merges, and, in some instances, briefly by Mr. Whelan. These witnesses were Mrs. Caldbick, Sheriff Kennedy, Auditor Libbey, Chairman of the Board of County Commissioners Loers, Prosecuting Attorney Whelan, Assistant Prosecutor Dailey, Dr. Carskadden, long associated with

Dr. Caldbick (deceased) in the practice of medicine and a close friend of the Caldbick family, and a Mr. McNamara of Seattle, long a friend of the Caldbicks and also of the trial judge.

The transcript of the testimony taken at the ensuing hearing is approximately seventy pages in length. Although this evidence is discussed at length in the court's memorandum opinion, no formal findings were made. The evidence, in our opinion, would justify findings to the following effect: that there was a foundation for the rumor which circulated through the Island community shortly after the tragedy that Mrs. Caldbick would personally employ an attorney to assist Mr. Whelan in trying the Brent case. However, she did not do so, and a day or two before the date of trial Whelan and Sheriff Kennedy went before the board of county commissioners and asked them to authorize the appointment of an assistant prosecutor. The commissioners inquired as to the probable expense and were told by Mr. Whelan that he could only estimate it, but he thought it would be necessary to pay a competent man at least one hundred dollars per day. The commissioners authorized the employment.

Whelan and Kennedy then went to Everett and put the proposition to Mr. Dailey, who at first demurred and finally consented to assist in the prosecution, provided that he would not be required to be present on the first day of the trial. He qualified as an assistant to the prosecutor of Island county by filing his written appointment and oath of office, and at all times acted in that capacity.

However, the evidence would warrant a formal finding that, shortly prior to the authorization of the appointment of an assistant prosecutor, Dr. Carskadden had told Mr. Loers, chairman of the board of county commissioners, that, if the county could not afford to hire an assistant for Whelan, he would pay for one himself.

To what extent, if any, the commissioners relied on Carskadden's statement in authorizing the employment of an assistant prosecutor, is a matter for speculation only. On the one hand, they must have considered the employ-

ment of an assistant in the light of a necessity. Mr. Whelan, although a man of ability, as we know from the trial record and from his single-handed prosecution of the appeal in this court, had no experience in prosecuting a capital charge. It was known at that time that the defendant would be represented by Beeler & Merges, a Seattle firm. Judge Beeler had not only had a long experience in both civil and criminal trial work, but had also served upwards of a year and a half as a judge of this court. Mr. Merges, a younger man, was, as the record amply demonstrates, a resourceful and extremely aggressive advocate. If Mr. Whelan had been thoroughly seasoned in criminal practice, the odds would still have been heavily against him; for the old saying that two heads are better than one is particularly applicable to such situations. On the other hand, the commissioners must have realized that the usual and ordinary expenses of the trial would of themselves exert a severe strain on the budget of their small county.

However, the evidence shows, or at least strongly indicates, that the commissioners, to use the court's expression, hoped that Dr. Carskadden ultimately might pay, or help pay, Mr. Dailey's bill. It was rendered a few days after the close of the trial in the sum of eight hundred dollars, approved shortly thereafter, and a warrant drawn in Dailey's favor. Still later the warrant was voided. Just before the end of December, 1946, Dr. Carskadden inquired of Mr. Whelan whether Mr. Dailey's fee for service at the trial had been paid, and, upon Mr. Whelan's replying that it had not, he drew his check for eight hundred dollars in favor of Mr. Dailey. Mr. Whelan transmitted the check to Dailey, who returned a receipt therefor, dated January 4, 1947.

It is, therefore, apparent that the post-trial hearing held for the purpose of determining if Mr. Dailey was employed by Mrs. Caldbick as her personal representative, failed to so find, but resulted in establishing that he was duly and lawfully employed by the county as an assistant prosecuting attorney.

■ However, the hearing did bring to light the fact that Dr. Carskadden, who was called as a witness by both parties to the case, had, previous to the employment of Dailey by the board of county commissioners, told the chairman of the board that, if the county could not afford to pay for an assistant to Whelan, he would do so, and the further fact that he did ultimately pay Dailey's fee. In our opinion, these facts cannot be held to establish "error of law occurring at the trial," the first of the grounds on which the order appealed from was granted. They do strongly suggest the third ground upon which the motion for new trial was made:

"(3) Newly discovered evidence, material to the defendant, which could not with reasonable diligence have been discovered and introduced at the trial."

■■ While it is not incumbent upon us to take cognizance of any reasons assigned for the granting of a new trial, unless they are incorporated in the formal order (*Wood v. Hallenbarter,* 12 Wn. (2d) 576, 122 P. (2d) 798), we think it advisable in this instance to point out that the court could not have granted the motion for a new trial on that ground. It was said in *Libbee v. Handy,* 163 Wash. 410, 418, 1 P. (2d) 312:

"In order to warrant the granting of a new trial on the ground of newly discovered evidence,

"'. . . it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; (5) that it is not merely cumulative, or impeaching.' 20 R. C. L. 290."

The rule has since been stated in identical language in the following cases: *Smith v. Kneisley,* 175 Wash. 29, 26 P. (2d) 387; *Morrow v. Morrow,* 179 Wash. 329, 37 P. (2d) 692; *State v. Adams,* 181 Wash. 222, 43 P. (2d) 1; *Chadwick v. Ek,* 5 Wn. (2d) 554, 106 P. (2d) 104; *Fritz v. Horsfall,* 24 Wn. (2d) 14, 163 P. (2d) 148; *Mitchell v. Mitchell,* 24 Wn. (2d) 701, 166 P. (2d) 938 (decided in 1946). See, also, 39 Am. Jur. 165, § 158.

██ ██  It is clear that the evidence that Dr. Carskadden offered to pay the fee of an assistant prosecutor if the county could not afford to do so, and that he did ultimately pay Mr. Dailey, satisfies the requirement of subds. (2) and (3) of the rule. We think, however, that it does not satisfy the requirement of subd. (1). This matter we will not discuss, since to do so would require an analysis of the whole of Dr. Carskadden's evidence in this already over-long opinion. It will be sufficient to point out that the newly discovered evidence does not meet the requirements of subds. (4) and (5).

Requirement (4) is to the effect that the newly discovered evidence must be "material to the issue." The issue in this case was: Was the killing of Caldbick justifiable? Evidence that Dr. Carskadden was willing to pay the fee of an assistant prosecutor is in no way material to that issue. It would merely tend to prove that Dr. Carskadden was a biased witness.

Requirement (5) is to the effect that a new trial will not be granted on the ground of newly discovered evidence if it is "merely cumulative, or impeaching." Impeaching evidence is such evidence as tends to impeach a witness. Impeachment of a witness is:

"An attack on the credibility of a witness by the testimony of other witnesses that the facts about which he has testified are other than as he has stated; by proof that his general reputation is bad; by proof that he has previously made contradictory or inconsistent statements, *or by proof of his bias, interest, or hostility.*" (Italics ours.) Ballentine's Law Dictionary 610.

"A witness may be impeached by showing his *bias,* as by proving near relationship, sympathy, hostility or prejudice, and this may be done by his own testimony or by other evidence." 28 R. C. L. 615, § 204. (Italics ours.)

See, also, 2 Bouvier's Law Dictionary 1508, and note in 41 L. R. A. (N.S.) 857, and particularly subd. VI thereof, entitled: "How witnesses are impeached."

The newly discovered evidence which was brought to light at the post-trial hearing was merely impeaching evidence. Its tendency was solely to raise an inference that

Dr. Carskadden was a biased witness, and thus affect the credibility of the evidence he gave at the trial.

The fifth requirement of the rule above quoted from *Libbee v. Handy, supra,* has been consistently enforced by this court for at least forty-two years. It is said in *Hoffman v. Hansen,* 118 Wash. 73, 78, 203 Pac. 53:

"This court has held a new trial should not be granted for newly discovered evidence which merely goes to the credibility of the opposite party as a witness, rather than to the right of recovery. *Harvey v. Ivory,* 35 Wash. 397, 77 Pac. 725 [decided in 1904]. 'This court has several times held that, where the only purpose of newly discovered evidence is to impeach or discredit evidence produced at the trial, a new trial will be denied.' *Orr v. Schwager & Nettleton,* 74 Wash. 631, 134 Pac. 501."

See, also, *State v. Beeman,* 51 Wash. 557, 559, 99 Pac. 756; *State v. Gaasch,* 56 Wash. 381, 383, 105 Pac. 817; and *Armstrong v. Yakima Hotel Co.,* 75 Wash. 477, 483, 135 Pac. 233.

The order appealed from is reversed and set aside, and the cause remanded to the superior court of Island county, Washington, for such further proceedings as are required by law. It is so ordered.

MALLERY, C. J., STEINERT, JEFFERS, and HILL, JJ., concur.