[No. 39208. Department Two. May 29, 1968.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANK ENOS
POPE, *Appellant.*\*

*James A. Alfieri* and *Richard G. Martinez,* for appellant.

*Robert E. Schillberg* and *Donald E. Priest,* for respondent.

LANGENBACH, J.†—Appellant was charged with the crime of murder in the first degree of his infant daughter. He was convicted of murder in the second degree and sentenced to life imprisonment. He has appealed.

There was credible evidence to show the following facts and circumstances. During the month of May, 1962, appel-

\*Reported in 442 P.2d 994.

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

lant was living with his wife and two infant children in Snohomish County. The daughter, Sandra, had been born June 28, 1961, as their second child. On the evening of May 22nd, appellant came home late; Sandra was in her bed, but crying. Appellant went into her bedroom and the crying suddenly increased. Later, he took her to a third bedroom, wrapped in a blanket, and the crying eventually ceased. Before the wife returned to sleep, she asked appellant about Sandra. She then got up and went into the bedroom where he had taken the child and discovered that she was dead. She called to him and he went in and saw the same result. He suggested that they call a doctor or the police, but she demurred. She testified: "I didn't think we ought to call a doctor or the police because she had bruises all over her body." The wife was also asked: "What did you notice about the baby's face?" "A. The mouth was open, eyes were open too."

In his argument over admission of certain exhibits, the prosecuting attorney stated: " . . . [W]e have charged that this baby was suffocated."

During cross-examination of the wife, she stated, further: "The first thing I remember him doing was picking her up. . . . As I remember, he just walked in and looked in the bed, he was standing over her and picked her up."

Appellant then took Sandra's small "car bed" with her body wrapped in a blanket in it, and placed this and a shovel in the back of their automobile. He and his wife and small son then drove off into the countryside to an out-of-the-way place. There he took the bed with the body in it, and the shovel, and went away from the automobile. Later, he returned with the bed and shovel, but without the body. They returned home early in the morning. The neighbors, who saw them return home, later testified that appellant seemed very nervous and seemed a different type of person. "[I]t seemed like there was something in the wind, in other words, you have a sense that something just isn't right."

There was testimony that appellant had expressed an aversion towards Sandra, and had also attempted pre-

viously to do her bodily harm by submerging her in the bathtub. Prior to the 23rd of May, both appellant and his wife had made inquiries of an agency concerning a proposed adoption—presumably of Sandra.

In the following September, appellant and his wife had been questioned by the authorities concerning the whereabouts of Sandra; and upon their refusal to testify, both were found guilty of contempt of court in the proceedings. They were jailed and later released. Upon their release, appellant and his wife left the state. Two other daughters were subsequently born to them.

In September and October, 1965, appellant was interrogated in California about the disappearance of Sandra. He was advised of his constitutional rights on each occasion, and once had an attorney present during the inquiry.

Eventually he was extradited and returned to Snohomish County. The trial upon the charge of murder in the first degree commenced in September, 1966. His wife was called as a witness by the state, and he objected to the reception of her testimony. This objection was overruled and is assigned as one of the errors.

On direct examination of a neighbor as a witness for the defense, appellant offered to prove that his wife had had a conversation with the witness in which the wife had stated that she did not love appellant, that he would soon get into trouble with the law, and that she would then be rich. An objection was sustained to this proffered testimony. This was assigned as the first error.

Appellant argued that his questions for this witness should have been allowed for impeachment purposes. In the course of this examination, the following occurred:

> Mr. Agranoff: Just, you can state what you observed her feelings or reactions were to Frank at that time? The witness: At that time she stated she did not— Mr. Gates: (Interposes)—Objection to what she said your Honor. The Court: Yes, sustained. It would be hearsay and *unresponsive to the question.* (Italics ours.)

Defense counsel then made an offer of proof in the absence of the jury.

Your Honor, for the purpose of the record I offer to prove by this witness that as of July 12th, 1962, this witness had a conversation with the witness Carol Pope at which time Carol Pope informed her that she did not love this defendant and that she was pregnant with I believe, Caroline, the third child of the parties and that she offered to this witness, to give this baby to her and that she also made the statement to this witness that one day this defendant was going to get himself into a lot of trouble with the law; and that she would then be rich.

I make this offer of proof to show the motive and bias of the witness Carol Pope and the truthfulness of her testimony. I don't believe that this is a collateral matter, I believe that this goes to the very essence of why Carol Pope as to why Carol Pope is testifying and what interest if any she has in the outcome of this trial.

After argument of counsel, the court ruled:

Of course the problem is Mr. Agranoff up to this point is that the reason sustained the the reason I sustained the objection was on the ground of hearsay. The second question directed to this witness was as to whether or not the attitude, that was substantially the question, whether or not she knew the attitude of Carol Pope had for her husband and of course, yes or no, whether or not she knew it, she didn't answer it in that fashion and to which of course, the Court has no choice but to sustain the objection to the question, I remember very clearly that on direct examination or redirect examination no where was Carol Pope asked, I do not have it anywhere in my notes I might add, no where was she asked about any conversation or any contact with this witness.

After the jury returned, appellant's counsel proceeded to inquire:

Mrs. Parkins I call your attention again to this area in July of 1962 during which I believe you stated that you had on one occasion come into contact with Carol Pope at the store—do you have any observations as to her attitude towards the children by what she said to you or what you said to her?

Mrs. Parkins: It's hard to describe Carol's feeling, she was aloof, in my mind she was cold, not friendly.

In this manner, the interrogation was permitted to proceed, and there is no merit in this assignment of error.

There were three other assignments of error. They involved the ruling permitting the wife to testify against appellant. These consisted of attacks upon RCW 5.60.060(1) as being, first, an ex post facto law; second, a violation of his privilege against self-incrimination, and third, a bill of attainder, all three being in violation of his constitutional rights. That statute, RCW 5.60.060(1) is as follows:

A husband shall not be examined for or against his wife, without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor can either during marriage or afterward, be without the consent of the other, examined as to any communication made by one to the other during marriage. But this exception shall not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other, *nor to a criminal action or proceeding for a crime committed by said husband or wife against any child of whom said husband or wife is the parent or guardian.* (Italics ours.)

At the time of the commission of this crime, on May 23, 1962, the last (italicized) clause of this statute had not been enacted. Subsequent to that time, in 1965, this clause was added by an amendment. This was after the perpetration of the crime, but prior to the time of filing the information and the trial itself. On this basis of the status of the amendment, appellant asserted that this became an ex post facto law; that it violated his right against self-incrimination, and was a bill of attainder. Consequently, the amendment was unconstitutional and did not apply in his case. These three constitutional matters were more or less argued together.

■ Much plausible argument in support of these contentions appears extensively in appellant's brief. However, a tragedy is a theory killed by a fact. In the recent case of *State v. Clevenger,* 69 Wn.2d 136, 417 P.2d 626 (1966), the very same arguments and citations of authority were raised against this particular section. In that case, as in this, the crime was committed before the enactment of the amendment. In that case, an amended information was filed after

the amendment became effective and the trial ensued thereafter. (It is of interest to note that appellant's counsel in the *Clevenger* case was the same trial counsel in this case.) The only difference between these two cases is that, there the crime charged was incest against an infant daughter, while here it was a charge of murder of an infant daughter. Consequently, what was said there is very pertinent to the same issues here. The constitutionality and the applicability of the statute were there upheld. We see no logical difference between that case and this one which would cause any differentiation in the application of this statute.

In his brief, appellant cited and relied on the case of *Hopt v. Utah,* 110 U. S. 574, 28 L. Ed. 262, 4 Sup. Ct. 202 (1883). It is relied upon as a leading case on the subject. Its holding also set forth (on this point) in the *Clevenger* case, *supra* at 141:

> The argument of appellant is completely answered by the language of the court in *Hopt v. Utah,* 110 U. S. 574, 28 L. Ed. 262, 4 Sup. Ct. 202 [as follows]. . . .
>
> The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute. Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, might, in respect of that offence, be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury, can be made applicable to prosecutions or trials there-

after had, without reference to the date of the commission of the offence charged.

There was no merit in these assignments of error.

### ON REMAND ON MOTION for NEW TRIAL

Contemporaneously with the oral argument on appeal, a motion for a new trial on the ground of newly discovered evidence was also argued. At that time, an order was entered remanding the case to the trial court for the purpose of hearing the motion for a new trial and the reception of such evidence as may then be submitted. Thereafter, the parties appeared before the trial judge who proceeded to receive and consider the additional testimony and proof of the respective parties.

The supplemental record of such proceedings now before this court shows the testimony of appellant's brother and his Massachusetts attorney, pertaining to a purported conversation had by said witnesses with the former wife of appellant, in which the former wife related a different version of the commission of this crime. The record also showed a flat denial by the former wife of any such conversation.

It also disclosed the testimony of appellant's trial counsel concerning his conversations with appellant's brother and his Massachusetts counsel pertaining to the preliminaries to the trial of said action. His testimony disclosed that the brother and the attorney knew of the charge of first-degree murder and that the wife would be called as a state witness.

Trial counsel, under examination by appellant's counsel, testified that he had discussed the former wife's testimony with appellant's brother. He asked the brother for his impression of the wife, what kind of girl she was, and what he knew about her. He stated, "I asked him how he felt, but—I asked him what he thought of Carol's truthfullness, veracity, honesty." This conversation took place about the 11th of August, 1966, just after the *Clevenger* decision had been received. Appellant's trial counsel continued: "He [the brother] was quite concerned about Frank and about

the difficulty he was in, and concerned about Carol's testifying against him."

Yet the record does not reveal whether or not the brother and his lawyer ever told trial counsel about the purport of the former wife's statement to them, which now seems so vital and important in this case.

The statement of facts revealed that appellant was represented by various attorneys in the several proceedings involved in this case. He had attorneys representing him in his California brushes with the law—one of whom was present during the present trial. He had had other attorneys in connection with the preliminaries in this action.

Appellant was present during the entire trial and heard his former wife relate the circumstances surrounding the death of the child. But the record is strangely silent concerning any controverting evidence as to the condition in which the child's body was discovered, if, in fact, the conditions were different than as related by the wife. (These details are set forth in the opening part of this opinion.) She testified simply that the child was wrapped in a blanket; her mouth and eyes were open. The prosecuting attorney stated that the charge was death by suffocation. She stated further that the appellant looked at the child in the bed and then picked her up. If the conditions were in fact different, which appellant certainly should have known, why was the wife not questioned in that regard?

The trial court, in summing up the evidence submitted on the motion for a new trial, stated that the Boston lawyer and appellant's brother knew of the seriousness of the charge against appellant. They also knew the former wife would be a witness for the state. They had been in touch with trial counsel and appellant before the trial and had thus discussed some of these matters. They knew, or should have known, of the importance of their testimony so far as affecting the former wife and her version of the tragedy. There was also the possibility that this testimony might be used against appellant to establish the cause of the death of the child.

In *State v. Mesaros,* 62 Wn.2d 579, 589, 384 P.2d 372 (1963), this court stated:

> In *State v. Adams,* 181 Wash. 222, 229, 43 P. (2d) 1 (1935), we stated as follows:
>
> ". . . The rule is now settled in this state that, to warrant the granting of a new trial on the ground of newly discovered evidence, it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. . . ."
>
> . . . .
>
> In the case of *State v. Prince,* 154 Wash. 409, 412, 282 Pac. 907 (1929), we said:
>
> ". . . where the only purpose of newly discovered evidence is to impeach or discredit evidence produced at the trial, a new trial will be denied. *Hoffman v. Hansen,* 118 Wash. 73, 203 Pac. 53; *Johnson v. Smith,* 118 Wash. 146, 203 Pac. 56."

■ An application of the tests stated in the *Mesaros* case to the evidence presented by appellant in his motion for a new trial does not warrant the granting of this motion. Having this information and then withholding it, pending the outcome of such a serious case, does not establish the fact that these statements were newly discovered evidence, not within the knowledge of appellant and his trial counsel or his Boston counsel. Because of the fact that this evidence was known prior to the trial, and because, at most, it was impeaching testimony only, the court denied appellant's motion for a new trial.

■ Thereupon, the trial court entered appropriate findings, conclusions, and an order denying the motion. A ruling on a motion for a new trial based on newly discovered evidence is a matter within the sound discretion of the trial court and will not be disturbed without a clear showing of an abuse of such discretion. *State v. Bengston,* 159 Wash. 296, 298, 292 Pac. 1107 (1930); *State v. Mesaros, supra.*

Appellant was represented by competent counsel, both at

his trial in this state and his consultations in California and Massachusetts. He was accorded a fair trial under proper instructions and under a statute recently upheld in another criminal action. There is no clear showing that the trial court abused its discretion in ruling on this motion. Consequently, the order denying a new trial is upheld and the judgment and sentence is affirmed.

It is so ordered.

FINLEY, C. J., HAMILTON and NEILL, JJ., concur.